**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AMERICAN FREEDOM DEFENSE INITIATIVE; PAMELA GELLER; and ROBERT SPENCER, | Case No. 11-civ-6774-PAE-THK |
| Plaintiffs, | ECF CASE |
| v. | Hon. Paul A Engelmayer |
| METROPOLITAN TRANSPORTATION AUTHORITY ("MTA"); and JAY H. WALDER, in his official capacity as Chairman and Chief Executive Officer of MTA, | Magistrate Judge Katz |
| Defendants. | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF CONTENTS ............................................................................................................. i

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ...................................................................................................................... 1

RELEVANT FACTS .................................................................................................................. 1

ARGUMENT .............................................................................................................................. 5

I.      PLAINTIFFS' POLITICAL SPEECH RESTS ON THE HIGHEST RUNG OF
        THE HIERARCHY OF FIRST AMENDMENT VALUES ............................................ 5

II.     PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION TO
        PREVENT FURTHER IRREPARABLE HARM TO THEIR FIRST
        AMENDMENT RIGHTS ............................................................................................... 6

        A.      Plaintiffs' Likelihood of Success on the Merits ...................................................... 6

                1.      Plaintiffs' Pro-Israel Advertisement Expressing a Political Message Is
                        Protected Speech. .................................................................................................. 6

                2.      Forum Analysis .................................................................................................. 7

                3.      Application of the Appropriate Standard ................................................. 10

        B.      Irreparable Harm to Plaintiffs without the Preliminary Injunction ...................... 18

CONCLUSION ......................................................................................................................... 18

CERTIFICATE OF SERVICE ................................................................................................. 19

## TABLE OF AUTHORITIES

*Cases*                                                                                   *Page*

*Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp.*,
No. 10-12134, 2011 U.S. Dist. LEXIS 35083 (E.D. Mich. Mar. 31, 2011) ...................................8

*Boos v. Barry*,
485 U.S. 312 (1988) ...................................................................................................13

*Cantwell v. Conn.*,
310 U.S. 296 (1940) .....................................................................................................5

*Carey v. Brown*,
447 U.S. 455 (1980)......................................................................................................5

*Chaplinsky v. N.H.*,
315 U.S. 568 (1942)....................................................................................................15

*Child Evangelism Fellowship of S.C. v. Anderson Sch. Dist. Five*,
470 F.3d 1062 (4th Cir. 2006) ...................................................................................17

*Children of the Rosary v. City of Phoenix*,
154 F.3d 972 (9th Cir. 1998) ..................................................................................9-10

*Cohen v. Cal.*,
403 U.S. 15 (1971) ..........................................................................................12, 14, 15

*Connick v. Myers*,
461 U.S. 138 (1983)......................................................................................................5

*Consol. Edison Co. of N.Y. v. Pub. Serv. Comm. of N.Y.*,
477 U.S. 530 (1980) ...................................................................................................11

*Cornelius v. NAACP Legal Def. & Educ. Fund*,
473 U.S. 788 (1985) ...........................................................................................passim

*Cogswell v. City of Seattle*,
347 F.3d 809 (9th Cir. 2003) .....................................................................................11

*Elrod v. Burns*,
427 U.S. 347 (1976) ............................................................................................passim

*Erznoznik v. City of Jacksonville*,
422 U.S. 205 (1975) ...................................................................................................14

*Forsyth Cnty. v. Nationalist Movement,*
505 U.S. 123 (1992) ...................................................................................................13, 17

*Glasson v. Louisville,*
518 F.2d 899 (6th Cir. 1975) ................................................................................................15

*Hague v. CIO,*
307 U.S. 496 (1939) ................................................................................................................7

*Hill v. Col.,*
530 U.S. 703 (2000) ..........................................................................................................6, 14

*Lehman v. City of Shaker Heights,*
418 U.S. 298 (1974)................................................................................................................9

*Lewis v. Wilson,*
253 F.3d 1077 (8th Cir. 2001) ..............................................................................................13

*NAACP v. Claiborne Hardware Co.,*
458 U.S. 886 (1982) ................................................................................................................5

*N.Y. Magazine v. Metro. Transp. Auth.,*
136 F.3d 123 (2d Cir. 1998) ........................................................................................*passim*

*Newsome v. Norris,*
888 F.2d 371 (6th Cir. 1989) ................................................................................................18

*Nieto v. Flatau,*
715 F. Supp. 2d 650 (E.D.N.C. 2010)...............................................................................8-9

*Perry Educ. Ass'n v. Perry Local Educators,*
460 U.S. 37 (1983) ......................................................................................................*passim*

*Planned Parenthood Ass'n/Chicago Area v. Chicago Transit Auth.,*
767 F.2d 1225 (7th Cir. 1985) ................................................................................................9

*Police Dept. of the City of Chicago v. Mosley,*
408 U.S. 92 (1972) ................................................................................................................11

*R.A.V. v. St. Paul,*
505 U.S. 377 (1992) .....................................................................................................*passim*

*Ridley v. Mass. Bay Transit. Auth.,*
390 F.3d 65 (1st Cir. 2004)..............................................................................................12, 16

*Reno v. ACLU*,
521 U.S. 844 (1997) .......................................................................................................14

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
515 U.S. 819 (1995) ................................................................................................ 10-11

*Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.*,
502 U.S. 105 (1991) .......................................................................................................13

*S.O.C., Inc. v. Cnty. of Clark*,
152 F.3d 1136 (9th Cir. 1998) ......................................................................................11

*Stromberg v. Cal.*,
283 U.S. 359 (1931).........................................................................................................5

*Terminiello v. City of Chicago*,
337 U.S. 1 (1949) ...........................................................................................................13

*United Food & Commercial Workers Union Local 1099 v. Southwest Ohio Reg'l Transit Auth.*,
163 F.3d 341 (6th Cir. 1998) ...............................................................................7, 9, 17

*United States v. Grace*,
461 U.S. 171 (1983) .........................................................................................................6

*United States v. Stevens*,
130 S. Ct. 1577 (2010).....................................................................................................15

**Rules**

Fed. R. Civ. P. 65.............................................................................................................1

**Constitution**

U.S. Const. amend. I ............................................................................................. *passim*

## INTRODUCTION

This case challenges Defendants' restriction on Plaintiffs' right to engage in protected speech in a public forum created by Defendants based on the content and viewpoint of Plaintiffs' message (hereinafter "Free Speech Restriction").   Defendants' Free Speech Restriction prohibited Plaintiffs from displaying advertisements on MTA buses that travel the public streets of New York City.

The issue presented in this motion pursuant to Rule 65 of the Federal Rules of Civil Procedure is whether denying Plaintiffs the right to engage in political speech in a public forum created by Defendants based on the content and viewpoint of their message causes irreparable harm to warrant preliminary injunctive relief.   As demonstrated below, the relevant facts and controlling law compel the granting of this motion.

## RELEVANT FACTS

By policy and practice, MTA has intentionally dedicated its advertising space on its vehicles, including its public buses, to expressive conduct (hereinafter "Free Speech Policy"). Pursuant to its Free Speech Policy, MTA permits a wide variety of commercial, noncommercial, public-service, public-issue, political, and religious advertisements on its property.   (*See* Geller Decl. at ¶ 3 at Ex. 1)

For example, pursuant to its Free Speech Policy, MTA permitted a religious group, Muslims for Peace, to run an advertisement on 90 public buses.   The advertisement stated, "Muslims for Peace, Love for All, Hatred for None, 1-800-WHY-ISLAM."  (Geller Decl. at ¶ 4, Ex. A, at Ex. 1).

Pursuant to its Free Speech Policy, MTA permitted the display of "Jesus for Jews" posters on the interior advertising space of MTA subways and on MTA's advertising space in

Times Square Station in Manhattan.  (Geller Decl. at ¶ 5, Ex. B, at Ex. 1).  And MTA permitted an atheist group, the Big Apple Coalition of Reason, to display an advertisement stating, "A million New Yorkers are good without God.  Are you?"  (Geller Decl. at ¶ 6, Ex. C, at Ex. 1).

In fact, pursuant to its Free Speech Policy, MTA permitted Plaintiffs to display a religious freedom advertisement on its vehicles that stated the following: "Fatwa on your head?  Is your family or community threatening you?  Leaving Islam?  Got questions?  Get answers!"  The advertisement also included the following website address: RefugeFromIslam.com. (hereinafter "Religious Freedom Advertisement").  (Geller Decl. at ¶ 7, Ex. D, at Ex. 1).  This advertisement was displayed on MTA buses from approximately May 17, 2010, to approximately June 13, 2010.  (Geller Decl. at ¶ 7 at Ex. 1).

MTA has also accepted advertisements that demean and mock people who oppose abortion, who are Republican, who support the TEA party, and who are Christian.  (Geller Decl. at ¶ 8, Ex. E, at Ex. 1).

Recently, MTA permitted the display of "End U.S. military aid to Israel" posters at MTA subway stations (hereinafter referred to as the "Anti-Israel Advertisement").  (Geller Decl. at ¶ 9, Ex. F, at Ex. 1).

On or about September 12, 2011, AFDI submitted its proposed advertisement to CBS Outdoor, which acts as the advertising agent for MTA, to place a new advertisement on MTA buses in New York City (hereinafter referred to as "Pro-Israel Advertisement").  (Geller Decl. at ¶ 10, Ex. G, at Ex. 1).

Plaintiffs' Pro-Israel Advertisement is political speech in direct response to the Anti-Israel Advertisement.  The Anti-Israeli Advertisement suggests that Israel's military is the impediment to peace between the Israelis and Palestinians and that U.S. military aid to Israel also

acts as an impediment to peace between the Israelis and Palestinians.  In other words, the Anti-Israel Advertisement blames Israel, its military, and U.S. military aid to Israel as the cause of Palestinian terror directed against innocent civilians in Israel and abroad.  (Geller Decl. at ¶ 11 at Ex. 1).

Plaintiffs' Pro-Israel Advertisement presents the message that there is no comparison or equivalence between savage civilian-targeting violence and Israel's civilized struggle for survival in a part of the world where civilized behavior is overshadowed by terrorism, despotism, and brutality.  (Geller Decl. at ¶ 12 at Ex. 1).

On September 21, 2011, CBS Outdoor, acting on behalf of MTA, informed Plaintiffs by email that MTA had rejected the advertisement copy on the grounds that it violated § 5.05(B)(11) of MTA's Advertising Standards ("MTA's Initial Rejection").  MTA's Initial Rejection concluded with an invitation to Plaintiffs to modify their speech in some way so as to be acceptable to MTA.  (Geller Decl. at ¶ 13, Ex. H, at Ex. 1).

The relevant portions of Section 5.05 read as follows:

5.05 – Advertising Standards

  A. The License Administrator [MTA] reserves the right to establish standards for the display of advertising on its properties and may amend such standards from time to time; provided, however, if such amendments are determined by the License Administrator to have a material impact on Gross Receipts and such amendments are not required by law, the License Administrator will negotiate in good faith a modification in the Minimum Annual Guarantee and Section 15.15 will apply.  The current standards are set forth in Section 5.05(b).  The Contractor [CBS Outdoor] shall review each advertisement prior to any installation work and agrees that whenever a question arises as to the propriety of an advertisement, in that it may be considered objectionable or controversial, the Contractor shall notify the License Administrator.

B.   The Contractor shall neither accept for display, install, display nor maintain any advertisement that falls within one or more of the following categories:

\* \* \*

11.   The advertisement contains images or information that demean an individual or group of individuals on **account of race, color, religion, national origin, ancestry, gender, age, disability or sexual orientation**.

(Geller Decl. at ¶ 14, Ex. I, at Ex. 1) (emphasis added).

By email on September 22, 2011, Plaintiffs, through legal counsel, rejected MTA's invitation to modify their speech and requested a "formal and final determination" ("Response to MTA's Initial Rejection"). Plaintiffs' Response to MTA's Initial Rejection made clear that the Pro-Israel Advertisement copy did not violate MTA's Advertising Standards (hereinafter "Demeaning Speech Standard") and that MTA's use of the Demeaning Speech Standard to prohibit Plaintiffs' speech was a Free Speech Restriction. (Geller Decl. at ¶ 15, Ex. J, at Ex. 1).

By email on September 23, 2011, CBS Outdoor, acting on behalf of MTA, informed Plaintiffs that MTA had formally and finally rejected Plaintiffs' Pro-Israel Advertisement on the grounds that it violated § 5.05(B)(11) of MTA's Advertising Standards. ("MTA's Final Rejection"). (Geller Decl. at ¶ 16, Ex. K, at Ex. 1).

Plaintiffs object to Defendants' censorship, which is effectively editing and thus suppressing the viewpoint they are attempting to express in their message. That viewpoint is that U.S. foreign policy supporting Israel in the face of savage violence is the correct moral, political, and strategic choice for the leader of the Free World. (Geller Decl. at ¶ 17 at Ex. 1).

As a direct and proximate result of Defendants' censorship, Plaintiffs' constitutionally protected right to freedom of speech has been abridged, and Plaintiffs are suffering an ongoing and irreparable harm every moment this censorship continues. (Geller Decl. at ¶ 18 at Ex. 1).

**ARGUMENT**

**I.     PLAINTIFFS' POLITICAL SPEECH RESTS ON THE HIGHEST RUNG OF THE HIERARCHY OF FIRST AMENDMENT VALUES.**

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech."  U.S. Const. amend. I.  Plaintiffs' First Amendment right to freedom of speech is protected from infringement by States and their political subdivisions, such as Defendants, by operation of the Fourteenth Amendment.  *See Cantwell v. Conn.*, 310 U.S. 296, 303 (1940).

The U.S. Supreme Court has long recognized that the freedom of speech is a fundamental right that is essential to our republican form of government.  As the Court noted, "[Speech] concerning public affairs is more than self-expression; it is the essence of self-government." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982) (citations omitted); *see also Stromberg v. Cal.,* 283 U.S. 359, 369 (1931) ("The maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means, an opportunity essential to the security of the Republic, is a fundamental principle of our constitutional system.").

Here, Plaintiffs' speech in the form of advertisements directed at U.S. foreign policy is classic political speech, which is accorded the highest constitutional protection.  In *Connick v. Myers*, 461 U.S. 138 (1983), the Court noted that "speech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection."  *Id.* at 145 (quoting *Claiborne Hardware Co.*, 458 U.S. at 913 (1982) & *Carey v. Brown*, 447 U.S. 455, 467 (1980)).

Because Defendants censored Plaintiffs' core political speech, Plaintiffs are entitled to a preliminary injunction to prevent further irreparable harm to their First Amendment freedoms.

## II.   PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION TO PREVENT FURTHER IRREPARABLE HARM TO THEIR FIRST AMENDMENT RIGHTS.

A party seeking a preliminary injunction must show a likelihood of success on the merits and irreparable harm. *N.Y. Magazine v. Metro. Transp. Auth.*, 136 F.3d 123, 127 (2d Cir. 1998).

In cases alleging a violation of the First Amendment right to freedom of speech, the likelihood of success of the moving party's claim is often the determinative factor. *See id.*

Whether a party is likely to succeed on the merits of a free speech claim is examined in essentially three steps.  First, the court must determine whether the speech in question— Plaintiffs' Pro-Israel Advertisement—is protected speech.  Second, the court must conduct an analysis as to the forum in question to determine the proper constitutional standard to apply. And third, the court must then determine whether the free speech restriction comports with the applicable standard.

Upon application of this analysis to the undisputed facts of this case, the court should issue the requested injunction to preserve and protect Plaintiffs' fundamental right to freedom of speech and to prevent further irreparable harm.

### A.   Plaintiffs' Likelihood of Success on the Merits.

#### 1.   Plaintiffs' Pro-Israel Advertisement Expressing a Political Message Is Protected Speech.

The first question is easily answered.  Conveying a political message with signs constitutes protected speech under the First Amendment. *See Hill v. Colo.*, 530 U.S. 703, 714-15 (2000) ("[S]ign displays . . . are protected by the First Amendment."); *United States v. Grace*, 461 U.S. 171, 176-77 (1983) (demonstrating with signs constitutes speech under the First Amendment).  This includes signs posted on bus advertising space. *See N.Y. Magazine v. Metro. Transp. Auth.*, 136 F.3d 123, 130 (2d Cir. 1998) (holding that bus advertisements constituted

protected speech); *United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Reg'l Transit Auth.*, 163 F.3d 341 (6th Cir. 1998) (same).

## 2.   Forum Analysis.

To determine the extent of Plaintiffs' free speech rights in this matter, the court must next engage in a First Amendment forum analysis.  "The [Supreme] Court has adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for [expressive] purposes."  *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 800 (1985).  Forum analysis has traditionally divided government property into three general categories: traditional public forums, designated public forums, and nonpublic forums. *Cornelius,* 473 U.S. at 800.  Once the forum is identified, the court must then determine whether the speech restriction is jutified by the requisite standard.  *Id.*

On one end of the spectrum lies the traditional public forum.  Traditional public forums, such as streets, sidewalks, and parks, are places that "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions."  *Hague v. CIO*, 307 U.S. 496, 515 (1939).  This forum is not implicated here.

Next on the spectrum is the designated public forum, which exists when the government intentionally opens its property for expressive activity.  *Perry Educ. Ass'n v. Perry Local Educators*, 460 U.S. 37, 44 (1983).  As the Supreme Court stated, "[A] public forum may be created by government designation of a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects."  *Cornelius*, 473 U.S. at 802.

7

A designated public forum is created when the government "intentionally open[s] a nontraditional forum for public discourse." *Cornelius*, 473 U.S. at 802. To discern the government's intent, courts "look[] to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum," as well as "the nature of the property and its compatibility with expressive activity." *Id.*

In a traditional or designated public forum, restrictions on speech are subject to strict scrutiny. *Id.* at 800 ("[S]peakers can be excluded from a public forum only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest. . . . Similarly, when the government has intentionally designated a place or means of communication as a public forum speakers cannot be excluded without a compelling government interest.").

At the opposite end of the spectrum is the nonpublic forum.[1] The nonpublic forum is "[p]ublic property which is not by tradition or designation a forum for public communication." *Perry Educ. Ass'n,* 460 U.S. at 46. In a nonpublic forum, the government "may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Id.* Thus, even in a nonpublic forum, a speech restriction must be reasonable and viewpoint neutral to pass constitutional muster. *Id.*; *see Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp.*, No. 10-12134, 2011 U.S. Dist. LEXIS 35083 (E.D. Mich. Mar. 31, 2011) (granting preliminary injunction and holding that while the bus advertising space was a limited public forum, the speech restriction was unreasonable); *see also Nieto v.*

---

[1] In the Second Circuit, the "limited public forum," while a "sub-class" of the designated public forum, is subject to the same analysis as a nonpublic forum. *N.Y. Magazine*, 136 F.3d at 128, n.2.

*Flatau*, 715 F. Supp. 2d 650 (E.D.N.C. 2010) (holding that a speech restriction on a military base, a nonpublic forum, was viewpoint based as applied to anti-Islam speech in violation of the First Amendment).

The Second Circuit has already determined that the forum at issue here (*i.e.*, the advertising space on MTA buses) is a designated public forum. *N.Y. Magazine v. Metro. Transp. Auth.*, 136 F.3d at 129-30.[2]  Other circuits analyzing similar transit authority advertising policies and practices have also concluded that the advertising space at issue was a designated public forum subject to strict scrutiny. *See United Food & Commercial Workers Union, Local 1099*, 163 F.3d at 355 (concluding that the advertising space on a bus system was a public forum and stating that "[a]cceptance of political and public-issue advertisements, which by their very nature generate conflict, signals a willingness on the part of the government to open the property to controversial speech"); *Planned Parenthood Ass'n/Chicago Area v. Chicago Transit Auth.*, 767 F.2d 1225 (7th Cir. 1985) (concluding that the advertising space on a bus system became a public forum where the transit authority permitted advertising on "a wide variety of commercial, public-service, public-issue, and political ads"); *cf. Lehman v. City of Shaker Heights,* 418 U.S. 298 (1974) (finding that where a city banned all political advertising it had not created a designated public forum); *Children of the Rosary v. City of Phoenix*, 154 F.3d 972 (9th Cir.

---

[2] The Second Circuit's ruling is binding on this court because the nature of the forum at issue has not changed from a designated public forum.  As confirmed by opposing counsel, MTA has not made any material changes to its policies since the ruling issued.  In the spirit of counsels' previous mutual collegiality and pursuant to the court's strong suggestion that the parties work collaboratively to narrow the factual and legal issues in dispute, Plaintiffs' counsel, David Yerushalmi, telephoned Peter Sistrom, lead counsel for MTA, and asked if Defendants were going to argue such a material change in MTA policies—the very policies at issue in *N.Y. Magazine*.  Mr. Sistrom said no.  This telephonic exchange was previously memorialized in Plaintiffs' letter brief, which was filed with the court and which set forth principal authorities pursuant to the court's instructions during the Initial Pretrial Conference held on December 8, 2011.  (Minute Entry dated 12/8/2011).  Defendants did not challenge this memorialization in their subsequent letter brief, which they also filed with this court.

1998) (concluding that the bus advertising panels were a nonpublic forum because the city had consistently restricted political and religious advertising).

Here, MTA unquestionably accepts a wide variety of commercial, public-service, public-issue, and political advertisements.  Clearly, MTA does not limit its advertising to purely commercial advertisements for revenue-generation purposes only.  MTA willingly accepts political and public-issue advertisements, including caustic and satirical ones, which by their very nature generate conflict, thus signaling a willingness on the part of MTA to open the space to controversial speech.  *N.Y. Magazine*, 136 F.3d at 130 (concluding that the bus advertising space was a public forum where the transit authority permitted "political and other non-commercial advertising generally").  Consequently, the forum at issue is a designated public forum, triggering the strict scrutiny standard for MTA's content- and viewpoint-based speech restriction.

### 3.     Application of the Appropriate Standard.

In a designated public forum, similar to a traditional public forum, the government's ability to restrict speech is sharply limited.  The government may enforce reasonable, *content neutral* time, place, and manner regulations of speech if the regulations are narrowly tailored to serve a significant government interest and leave open ample alternative channels of communication.  *Perry Educ. Ass'n,* 460 U.S. at 45.  However, *content-based* restrictions on speech, such as the restriction at issue here, are subject to strict scrutiny.  *Cornelius*, 473 U.S. at 800.  That is, "[s]peakers can be excluded from a public forum only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest." *Id*.  For "[i]t is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys."  *Rosenberger v. Rector & Visitors of the Univ. of*

*Va.*, 515 U.S. 819, 828 (1995).    Thus, content-based restrictions "are presumptively unconstitutional." *S.O.C., Inc. v. Cnty. of Clark*, 152 F.3d 1136, 1145 (9th Cir. 1998).   The government may not "impose special prohibitions on those speakers who express views on disfavored subjects" or on the basis of "hostility—or favoritism—towards the underlying message expressed." *R.A.V. v. St. Paul*, 505 U.S. 377, 386-92 (1992); *see Police Dept. of the City of Chicago v. Mosley*, 408 U.S. 92, 96 (1972) (holding that the government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express more controversial views).

To determine whether a restriction is content-based, the courts look at whether it "restrict(s) expression because of its message, its ideas, its subject matter, or its content." *Consol. Edison Co. of N.Y. v. Public Serv. Comm. of N.Y.*, 447 U.S. 530, 537 (1980).   In this case, Defendants' "Free Speech Restriction" was content-based—prohibiting what the government believed to be "demeaning" content is quite obviously a content-based restriction.

Moreover, Defendants rejected Plaintiffs' advertisement not only on the basis of its content, which is impermissible in a designated public forum, but on the basis of the ***viewpoint*** expressed by the speaker, (*i.e.*, enemies of Israel who engage in terrorism are "savages" and should never be supported).   Viewpoint-based censorship is fatal in <u>any</u> forum.   When speech "fall[s] within an acceptable subject matter otherwise included in the forum, the State may not legitimately exclude it from the forum based on the viewpoint of the speaker." *Cogswell v. City of Seattle*, 347 F.3d 809, 815 (9th Cir. 2003).   Thus, viewpoint discrimination occurs when the government "denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject," *Cornelius*, 473 U.S. at 806, <u>*as in this case*</u>.   Here, there is no question that the subject matter (U.S. foreign policy toward Israel) is permissible.   However,

MTA objects to Plaintiffs' viewpoint toward that includable subject in violation of the First Amendment.

In *Ridley v. Mass. Bay Transit. Auth.*, 390 F.3d 65 (1st Cir. 2004), the court held that the MBTA's restriction on certain advertisements that were critical of laws prohibiting drug use were viewpoint based in violation of the First Amendment.  The MBTA attempted to avoid this fact by arguing that the same message could run if a different manner of expression were used. This is precisely the argument made by Defendants' counsel in this case during the Initial Pretrial Conference.  The First Circuit properly rejected the argument, stating,

> The MBTA's concession means simply that it will run advertisements which do not attract attention but will exercise its veto power over advertisements which are designed to be effective in delivering a message.  Viewpoint discrimination concerns arise when the government intentionally tilts the playing field for speech; reducing the effectiveness of a message, as opposed to repressing it entirely, thus may be an alternative form of viewpoint discrimination.

*Id.* at 88.  In making this point, the Court cited to *R.A.V. v. City of St. Paul*, 505 U.S. 377, 392 (1992), for the proposition that "[i]t is viewpoint discrimination for the government to 'license one side of a debate to fight freestyle, while requiring the other to follow Marquis of Queensberry rules.'"  The court also cited to *Cohen v. Calif.*, 403 U.S. 15, 26 (1971), for the proposition that "the emotive impact of a particular means of expression is often more important than the underlying cognitive impact of a message, and this emotive impact is also protected by the Constitution."

Here, it is evident that Defendants objected to Plaintiffs' view that that there is no comparison or equivalence between savage civilian-targeting violence and Israel's civilized struggle for survival in a part of the world where civilized behavior is overshadowed by terrorism, despotism, and brutality.  By doing so, Defendants have engaged in an unconstitutional form of viewpoint discrimination.

Indeed, at a minimum and as noted previously, Defendants' Free Speech Restriction is content-based (*i.e.*, that the message was "demeaning").   And this conclusion is further underscored by the fact that Defendants restricted Plaintiffs' speech based on the subjective belief that others might also object to the message expressed by the advertisement.   However, the Supreme Court has long held that a listener's (or, in this case, viewer's) reaction to speech is not a content-neutral basis for regulation.  *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 134 (1992).  "The First Amendment knows no heckler's veto."  *Lewis v. Wilson,* 253 F.3d 1077, 1082 (8th Cir. 2001).  While restrictions on speech because of the "secondary effects" that the speech creates are sometimes permissible, an effect from speech is not secondary if it arises from the content of the speech or the viewpoint of the speaker.   "The emotive impact of speech on its audience is not a 'secondary effect.'"  *Boos v. Barry*, 485 U.S. 312, 321 (1988) (opinion of O'Connor, J.).

In *Terminiello v. City of Chicago*, 337 U.S. 1 (1949), the Supreme Court famously stated,

[A] function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging.  It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea.  That is why freedom of speech . . . is . . . protected against censorship or punishment. . . .  There is no room under our Constitution for a more restrictive view.

*Id*. at 4.  Therefore, the fact that Plaintiffs' speech may actually offend some persons does not lessen its constitutionally protected status; it enhances it.  "The fact that society may find speech offensive is not a sufficient reason for suppressing it.  Indeed, if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection."  *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 118 (1991) (citations omitted); *Forsyth Cnty.,* 505 U.S. at 135 (noting that speech cannot be "punished or banned,

simply because it might offend a hostile mob"); *Hill*, 530 U.S. at 715 & 710, n.7 ("The fact that the messages conveyed by [the signs] may be offensive to their recipients does not deprive them of constitutional protection.").

Indeed, "the Constitution does not permit government to decide which types of otherwise protected speech are sufficiently offensive to require protection for the unwilling listener or viewer." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 210 (1975). Rather than censoring the speaker, the burden rests with the viewer to "avoid further bombardment of [his] sensibilities simply by averting [his] eyes." *Cohen*, 403 U.S. at 21. As the *Cohen* Court noted, "[W]e cannot indulge the facile assumption that one can ***forbid particular words*** without also running a substantial risk of suppressing ideas in the process. Indeed, governments might soon seize upon the censorship of particular words as a convenient guise for banning the expression of unpopular views."[3] *Id.* at 26 (emphasis added). In fact, First Amendment protection even extends to regulatory schemes that would allow a disapproving citizen to silence a disagreeable speaker by complaining on other, apparently neutral, grounds. *See Reno v. ACLU*, 521 U.S. 844, 880 (1997) (holding that the prohibition on knowingly communicating indecent material to minors in Internet forums was invalid because it conferred "broad powers of censorship, in the form of a 'heckler's veto,' upon any opponent of indecent speech who might simply log on and inform the would-be discoursers that his 17-year-old-child . . . would be present").

---

[3] In *Cohen*, the Court held, *inter alia*, that the conviction for breach of the peace of a defendant who walked through a courthouse corridor wearing a jacket bearing the words "F*** the Draft" in a place where women and children were present violated the First Amendment and could not, therefore, be justified either upon a theory that the quoted words were inherently likely to cause a violent reaction or upon a more general assertion that the government, acting as a guardian of public morality, may properly remove offensive words from the public's view. *See Cohen*, 403 U.S. at 22-23. Consequently, in response to this court's query during the Initial Pretrial Conference, *Cohen* makes clear that the government cannot simply ban words, such as the "F-word" or the "N-word," without running afoul of the Constitution.

Thus, pursuant to the First Amendment, the government is not permitted to affirm the heckler; rather, it must protect the speaker and punish those who react lawlessly to a controversial message.  As the Sixth Circuit observed, "[The government] has the duty not to ratify and effectuate a heckler's veto nor may he join a moiling mob intent on suppressing ideas. Instead, he must take reasonable action to protect . . . persons exercising their constitutional rights." *Glasson v. Louisville*, 518 F.2d 899, 906 (6th Cir. 1975).

In sum, Defendants cannot, consistent with the Constitution, prohibit Plaintiffs' Pro-Israel Advertisement because they or other viewers might find it offensive or "demeaning." Otherwise, the government "would effectively empower a majority to silence dissidents simply as a matter of personal predilections."  *Cohen*, 403 U.S. at 21.

Moreover, in addition to this as-applied challenge, Defendants' Demeaning Speech Standard is facially invalid based on *R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992).  In *R.A.V.*, the Court was asked to review the constitutionality of an ordinance that prohibited "conduct that amounts to 'fighting words' *i.e*., 'conduct that itself inflicts injury or tends to incite immediate violence. . . ,'" so as to protect "the community against bias-motivated threats to public safety and order."  *Id*. at 380-81 (emphasis added).  Even though "fighting words" may be restricted under the First Amendment, *see Chaplinsky v. N.H.,* 315 U.S. 568, 572 (1942),[4] the Court struck down the ordinance because it only applied to prohibit such conduct "on the basis of race, color, creed, religion or gender" and was therefore content based.  *R.A.V.,* 505 U.S. at 391.  For similar reasons, Defendants' Demeaning Speech Standard, which prohibits advertisements containing "images or information that demean an individual or group of individuals on account of race,

---

[4] The Supreme Court has allowed restrictions on specific "historic and traditional categories" of speech that are "long familiar to the bar," *United States v. Stevens*, 130 S. Ct. 1577, 1584 (2010), such as restrictions on "fighting words," obscenity, fraud, perjury, incitement, and defamation. Plaintiffs' speech is none of these.

color, religion, national origin, ancestry, gender, age, disability or sexual orientation," is content (and viewpoint) based.[5]

In striking down the ordinance at issue in *R.A.V.*, the Court stated, "The First Amendment does not permit [the government] to impose *special prohibitions* on those speakers who express views on disfavored subjects." *Id.* (emphasis added). As the Court noted, one of the primary evils of content discrimination is that it "raises the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace." *Id.* at 387. That "primary evil" is present in this case in spades. The Court also noted that the unconstitutional ordinance, similar to the Demeaning Speech Standard here, "goes even beyond mere content discrimination, to actual viewpoint discrimination" by not restricting those "arguing in *favor* of racial, color, etc., tolerance and equality," while placing special prohibitions on "those speakers' opponents." *Id.* at 391-92. In sum, *R.A.V. v. City of St. Paul* compels a finding that the Demeaning Speech Standard is facially invalid.

Finally, there is yet another basis for issuing the requested injunction in this case: Defendants' Speech Restriction is arbitrary. As a matter of law, a speech restriction that permits arbitrary and capricious application is not reasonable and thus unconstitutional in any forum. As the Sixth Circuit properly observed in a case challenging a restriction on a bus advertisement, "[t]he absence of clear standards guiding the discretion of the public official vested with the authority to enforce the enactment invites abuse by enabling the official to administer the policy

---

[5] In *Ridley v. Mass. Bay Transit. Auth.*, 390 F.3d 65, 90 (1st Cir. 2004), the court did not strike down the MBTA guidelines that prohibit demeaning or disparaging bus advertisements because, unlike the guidelines at issue here, the MBTA guidelines were drafted "in more general terms, not tied only to certain categories such as race, religion, and gender." The court noted, "Most likely the revision was made in light of *R.A.V.* [*v. City of St. Paul*]. . . . The current regulation simply prohibits the use of advertisements that 'demean[] or disparage[] an individual or group of individuals,' *without listing any particular protected groups*." *Id.* at 90-91 (emphasis added).

on the basis of impermissible factors." *United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Reg'l Transit Auth.*, 163 F.3d 341, 359 (6th Cir. 1998).  And as the Supreme Court warned in *Forsyth Cnty.*, 505 U.S. at 130, "A government regulation that allows arbitrary application . . . has the potential for becoming a means of suppressing a particular point of view," as in this case.  *See also Child Evangelism Fellowship of S.C. v. Anderson Sch. Dist. Five*, 470 F.3d 1062, 1068 (4th Cir. 2006) ("A second corollary of the prohibition on viewpoint discrimination is the principle that administrators may not possess unfettered discretion to burden or ban speech, because 'without standards governing the exercise of discretion, a government official may decide who may speak and who may not based upon the content of the speech or viewpoint of the speaker.'") (quoting *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 763-64 (1988)).

Here, there is no objective way to measure whether a particular advertisement is demeaning (or sufficiently demeaning) to warrant censorship.  In fact, MTA has readily accepted advertisements that were offensive to (and demeaning toward) certain individuals or groups of individuals, such as those set forth in Exhibits B, C, and E of the declaration of Plaintiff Geller, which is attached to this memorandum as Exhibit 1.  Indeed, Defendants have no objective standards or guidelines for determining whether a particular message is sufficiently "demeaning" to warrant suppression, leaving it instead to the personal predilections of those officials empowered to exercise their censorship veto in violation of the First Amendment.[6]

---

[6] Given the types of demeaning speech Defendants have historically allowed to be displayed on MTA buses and other properties, the unreasonable and arbitrary censorship of Plaintiffs' Pro-Israel Advertisement is evident.  And such unreasonable and arbitrary restrictions on speech are impermissible even in a nonpublic forum.  *Perry Educ. Ass'n,* 460 U.S. at 46 (holding that in a nonpublic forum, the speech regulation must be "reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view").

**B.      Irreparable Harm to Plaintiffs without the Preliminary Injunction.**

As the U.S. Supreme Court has long held, "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).   In *N.Y. Magazine*, the Second Circuit echoed this fundamental holding:

> As for irreparable harm, the district court noted that if New York Magazine were correct as a matter of law that MTA's action unlawfully abridged its freedom of speech as guaranteed by the First Amendment, New York Magazine established irreparable harm.   The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.   As the district court correctly found that the facts presented constitute a violation of New York Magazine's First Amendment freedoms, New York Magazine established *a fortiori* both irreparable injury and a substantial likelihood of success on the merits.

*N.Y. Magazine,* 136 F.3d at 127 (quotation marks and citations omitted); *see also Newsome v. Norris*, 888 F.2d 371, 378 (6th Cir. 1989) ("The Supreme Court has unequivocally admonished that even minimal infringement upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief.") (citing *Elrod*).   Consequently, Plaintiffs have established that they will be irreparably harmed absent the requested injunction.

## CONCLUSION

For the foregoing reasons, Plaintiffs are entitled to a preliminary injunction enjoining Defendants' Free Speech Restriction, thereby allowing Plaintiffs to exercise their fundamental right to freedom of speech through the display of their Pro-Israel Advertisement.

Respectfully submitted,

**AMERICAN FREEDOM LAW CENTER**

/s/ David Yerushalmi
David Yerushalmi, Esq. (Ariz. Bar No. 009616;
DC Bar No. 978179; Cal. Bar No. 132011; NY Bar No. 4632568)
640 Eastern Parkway, Suite 4C
Brooklyn, NY 11213
dyerushalmi@americanfreedomlawcenter.org
(646) 262-0500

/s/ Robert J. Muise
Robert J. Muise, Esq.* (MI Bar No. P62849)
P.O. Box 131098
Ann Arbor, MI 48113
rmuise@americanfreedomlawcenter.org
(734) 635-3756
*Admitted *pro hac vice*

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 1, 2012, a copy of the foregoing and accompanying exhibits were filed electronically.  Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

Respectfully submitted,

**AMERICAN FREEDOM LAW CENTER**

/s/ Robert J. Muise
Robert J. Muise, Esq.* (MI Bar No. P62849)
*Admitted *pro hac vice*

*Counsel for Plaintiffs*