UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: July 20, 2012
```

AMERICAN FREEDOM DEFENSE INITIATIVE et al.,

                             Plaintiffs,

                -v-

METROPOLITAN TRANSPORTATION AUTHORITY
et al.,

                           Defendants.

11 Civ. 6774 (PAE)

OPINION & ORDER

------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

      This case involves a challenge under the First Amendment to the refusal by the

Metropolitan Transit Authority ("MTA"), the public authority which provides mass transit in the

New York City metropolitan area, to permit a political advertisement to run on the exteriors of

buses in New York City.

      Plaintiff American Freedom Defense Initiative ("AFDI") is a pro-Israeli advocacy

organization known for its provocative writings on Middle Eastern affairs.  In September 2011,

AFDI submitted a text-only advertisement (the "AFDI Ad" or the "Ad") to MTA.  The Ad read:

"In any war between the civilized man and the savage, support the civilized man. / Support Israel

/ Defeat Jihad."  MTA rejected the Ad, finding that it violated one of MTA's written advertising

standards.  That standard (the "no-demeaning standard") prohibits ads that "contain[] . . .

information that demean[s] an individual or group of individuals on account of race, color,

religion, national origin, ancestry, gender, age, disability or sexual orientation."

      In this lawsuit, AFDI seeks a preliminary injunction enjoining MTA's no-demeaning

advertising standard, thereby permitting the AFDI Ad to run.  For the reasons that follow, the

Court agrees that that advertising standard, as presently written, violates the First Amendment. The Court, accordingly, grants AFDI's motion for a preliminary injunction.

## I.     Background

### A.  Factual Background

#### 1.  The Parties

AFDI is an advocacy organization.  Its stated objective is to protect "our basic freedoms and values" by, *inter alia*, "sponsoring religious freedom and political speech bus and billboard campaigns."  Compl. ¶¶ 6, 8.  AFDI advocates pro-Israeli causes in the political, military, and social realms.  Its advertisements and publications attack radical Islam and the "Islamization of America."  *See, e.g.*, Atlas Shrugs, http://atlasshrugs2000.typepad.com (last visited July 18, 2012) (AFDI-associated website which, among other things, promotes a book, written by AFDI's Executive Director, entitled "Stop the Islamization of America:  A Practical Guide to the Resistance").  AFDI's writings, as described in further detail later, have equated the "struggle" between Israel and "the Muslim world" with "the struggle between good and evil."  *See infra* § III.A.  Among other means, AFDI spreads its message through articles, books, blog posts, television, and other media appearances by its officers; by filing lawsuits; and by holding rallies and other demonstrations.  Plaintiffs Pamela Geller and Robert Spencer are, respectively, AFDI's Executive and Associate Directors.

MTA is a New York State public authority and public benefit corporation.  Together with its affiliated operating agencies, MTA provides mass transportation services in the New York

City metropolitan area.  Defendant Jay H. Walder, sued in his official capacity, was, at the time

of the Complaint, MTA's Chairman and Chief Executive Officer.[1]

> 2.  MTA's Advertising Standards

MTA accepts paid ads for placement within its transit facilities and on its transportation

vehicles, including on the sides and tails of public buses.  Declaration of Jeffrey Rosen, MTA

Director of Real Estate ("Rosen Decl.") ¶ 4.  MTA is cash-strapped.  It regards the money it

receives from such ads as an important source of revenue.  *Id.* ¶¶ 4–5.  MTA accepts both

commercial ads and non-commercial ads (*i.e.*, ads by government agencies, not-for-profit and

religious organizations, political ads, and public service announcements);[2] in 2010, MTA

received $5.17 million in revenue from non-commercial advertising.  *Id.* ¶ 11.

To help it administer its advertising program, MTA has entered into license agreements

with various outdoor advertising companies.  *Id.* ¶¶ 6, 9.  MTA's license agreement with CBS

Outdoor Group covers advertising space on, *inter alia*, the interior and exterior of buses operated

by the New York City Transit Authority ("NYCTA").  *Id.* ¶ 9.

On March 25, 1994, MTA first adopted standards governing which ads it would accept to

run in its facilities and on its vehicles (the "1994 advertising standards").  *Id.* ¶ 13 & Ex. B.  In

adopting these standards, MTA "strove to balance several legitimate interests" which it believed

relevant to its role as a public benefits corporation serving a diverse ridership.  These included:

- maximizing advertising revenue;

- maintaining orderly administration of transportation systems;

---

[1] Since the filing of the Complaint, Walder has resigned this post.  MTA's present Chairman and CEO is Joseph J. Lhota.

[2] Examples of non-commercial advertisements that MTA has run can be found at Rosen Decl. Exs. H, I, K, and L and at the Declaration of Pamela Geller, Executive Director of AFDI ("Geller Decl.") Exs. A, B, C, D, and F.

- protecting minors who utilize MTA's facilities;

- avoiding misappropriation of views expressed in advertising to MTA; and

- shielding MTA patrons from advertisements which may not lawfully be publicly displayed under New York law.

*Id.* ¶ 14.

The 1994 advertising standards prohibited ads which: (1) contain, false, misleading, or deceptive claims; (2) promote unlawful or illegal goods, services, or activities; (3) inaccurately imply or declare MTA's endorsement of the subject of the advertisements; (4) contain obscene materials as defined under New York Penal Law; (5) advertise commercial material unsuitable for minors under New York Penal Law; (6) display offensive sexual material; (7) are libelous or violate New York Civil Rights Law § 50; or (8) commercially promote tobacco or tobacco products. *Id.* at Ex. B. At the same time, MTA created a three-member Advertising Standards Committee. The Committee had final responsibility for determining whether an ad fell within one of the above-named proscribed categories. *Id.*

In 1997, MTA revised its advertising standards, creating the standards that are in place today (the "advertising standards"). In addition to the interests articulated for adopting the 1994 advertising standards, MTA identified its "compelling interest" in maintaining employees' morale and shielding its ridership from "unwanted and unavoidable confrontations with advertisements that are demeaning on the basis of race, color, religion, national origin, ancestry, gender, age, disability or sexual orientation." *Id.* at Ex. C. The 1997 advertising standards left intact the above prohibitions, and added prohibitions on ads which: (9) depict a minor in a sexually suggestive manner; (10) are adverse to MTA's commercial or administrative interests, or its employees' morale; (11) "contain[] images or information that demean an individual or group of individuals on account of race, color, religion, national origin, ancestry, gender, age,

disability or sexual orientation"; (12) contain violent images; (13) promote an escort or dating service; or (14) the public would find to be offensive or improper. *Id*.

The prohibition relevant to this case is the one on ads which demean an individual or group on account of "race, color, religion, national origin, ancestry, gender, age, disability or sexual orientation." This prohibition, the no-demeaning standard, is codified at § 5.05(B)(11) of the advertising standards. Geller Decl. Ex. I.

The advertising standards adopted in 1997 also abolished the three-member Advertising Standards Committee. They vested the final determination whether an ad comported with the advertising standards in the "MTA Contract Administrator or his designee." Rosen Decl. Ex. C. Specifically, under the current advertising standards, the advertising contractor first assesses whether a proposed advertisement may fall into a prohibited category; if so, the contractor alerts the MTA Director of Real Estate. *Id*. ¶ 26. If the Director of Real Estate agrees that the ad falls within a prohibited category, the advertiser may be given an opportunity to revise the ad to conform to the relevant standard. *Id*. Alternatively, the Director of Real Estate may conclude that no revision is feasible which would bring the ad into conformity with MTA's advertising standards; where this is the case, an advertiser may request a formal determination. *Id*. In making such a determination, the MTA Director of Real Estate "may consider any materials submitted by the advertiser, and may consult with the advertising contractor, or with the MTA General Counsel, the Executive Director, the chairman of the Board, or their respective designees." *Id*. at Ex. C. The determination by the Director of Real Estate is final. *Id*.

In his declaration on behalf of the defendants, current MTA Director of Real Estate Jeffrey Rosen represents that, since he joined MTA in September 2009, only three proposed ads (other than the AFDI Ad at issue here) have been rejected for failure to conform to the

advertising standards. *Id*. ¶ 27.  One was an ad for Target stores; it asked riders whether they

were "Sandwiched on the train?"  *Id*. ¶ 29 & Ex. D.  At MTA's request, Target replaced this ad

with another one.  *Id*. ¶ 29.  The second rejected ad was from the New York State Paid Family

Leave Coalition; it depicted a sneezing subway passenger next to copy that told readers:  "You

might catch more than the subway this morning."  *Id*. ¶ 30 & Ex. E.  At MTA's request, the

advertiser replaced that ad, too, with another one.  *Id*. ¶ 30.  MTA rejected both ads as adverse to

MTA's commercial or administrative interests, one of the prohibited categories under the

advertising standards.  *Id*. ¶¶ 29–30.  Finally, a series of three ads proposed by Daffy's clothing

store were rejected because they contained offensive sexually suggestive material.  *Id*. ¶¶ 31–32.

The ads each displayed a photograph of a seemingly naked female model, whose breasts,

genitals, and buttocks were covered with text boxes.  *Id*. ¶ 32.

　　　　Other than the AFDI Ad at issue in this case, no ad has been rejected as inconsistent with

MTA's no-demeaning standard.  *Id*. ¶ 27.

　　　　　　　　3.  AFDI's Ads

　　　　Before submitting the ad that is the subject of this case, AFDI had submitted two ads to

MTA; both were accepted.  *Id*. ¶ 35.

　　　　In May 2010, AFDI ran an ad on NYCTA buses, which read:  "Fatwa on your head?  Is

your family or community threatening you?  Leaving Islam?  Got questions?  Get answers!"  *Id*.

¶ 36 & Ex. H.  The ad referred readers to a website, RefugeFromIslam.com.  *Id*. at Ex. H.

　　　　In August 2010, AFDI ran another ad on NYCTA buses.  *Id*. ¶ 37.  On the left side, it

depicted an image of the World Trade Center's Twin Towers burning, alongside the words

"September 11, 2001 / WTC Jihad Attack."  On the right-hand side was a building identifiable as

a mosque, with a star and crescent, alongside the words "September 11, 2011 / WTC Mega

Mosque." *Id.* at Ex. I.  A two-sided arrow connected the images and text on the left with the images and text on the right, under the words "Why There?" and "Ground Zero."  Additional text on the ad directed readers to a website, SIOAonline.com, and stated that the ad was paid for by AFDI.  *Id.*  CBS Outdoor Group, MTA's advertising contractor, had initially asked AFDI to revise that ad, without consulting MTA.  In response, AFDI brought suit against MTA in federal district court, seeking a temporary restraining order and a preliminary injunction.  MTA then reviewed the ad, determined it was consistent with its advertising standards, and ran the ad; AFDI thereupon discontinued the suit.  *Id.* ¶ 37.

The events leading to the instant dispute began in March 2011, when AFDI submitted a proposed ad to CBS Outdoor Group, to be run on the exterior of NYCTA buses.  *Id.* ¶ 39.  The copy along the top of the ad read:  "In any war between the civilized man and the savage, support the civilized man." *Id.* at Ex. J.  The ad then displayed a series of photographs, including young soldiers wearing keffiyehs and holding weapons, a man standing behind a lectern and in front of three flags displaying the star and crescent, men in keffiyehs marching and giving a salute, and Adolf Hitler with his hands on the shoulders of a child wearing a keffiyeh.  *Id.*  Below the photographs, the ad read:  "Support Israel / Defeat Jihad" and "Paid for by the American Freedom Defense Initiative"; it directed readers to two websites, AtlasShrugs.com and FreedomDefenseInitiative.com.  *Id.*

Soon after, AFDI withdrew that proposed ad and submitted a revised proposed ad to CBS Outdoor Group.  *Id.* ¶ 39.  The revised proposed ad differed from the first in that two photographs were removed and replaced (including by a photograph of an Arab woman wearing a hijab and holding a sign reading "God Bless Hitler"); the text below now read:  "Support Israel / Defeat Islamic Fundamentalism." *Id.* at Ex. J.  CBS Outdoor Group alerted MTA that it

believed the ad violated the advertising standards.  AFDI, however, did not seek a final

determination from MTA.  *Id.* ¶ 41.

      In September 2011, AFDI submitted a third proposed ad to be run on NYCTA buses—

the AFDI Ad, which is the subject of this suit.  *Id.* ¶ 45.  AFDI advised MTA that the Ad was

intended to respond to two ads that had been run in subway stations that same month.  Geller

Decl. ¶ 11.  The first was an ad submitted by the WESPAC Foundation Inc.  It depicted a man

with his daughter, next to the words "Palestinian designer" and a man with his baby, next to the

words "Israeli social worker."  The WESPAC ad read:  "Be on our side.  We are the side of

peace and justice.  End U.S. military aid to Israel."  The WESPAC ad directed readers to a

website, www.TwoPeoplesOneFuture.org.  Rosen Decl. Ex. K.  The second ad, submitted by

StandWithUs, depicted two young boys with their arms over each others' shoulders, one wearing

a keffiyeh around his neck and the other wearing a yarmulke.  The StandWithUs ad read:  "Israel

Needs A Partner For Peace.  The Palestinian Authority Must Accept The Jewish State & Teach

Peace, Not Hate."  The StandWithUs ad then directed readers to a website,

www.SayYesToPeace.org.  *Id.* at Ex. L.  CBS Outdoor Group had brought both of these ads to

MTA's attention as potentially inconsistent with the advertising standards, but MTA determined

that the ads met the standards, and ran them.  *Id.* ¶¶ 43–44.

      The AFDI Ad modified the two ads AFDI had previously proposed but withdrew.  The

Ad, pictured below, contained no photographs.  Its text, appearing in white against a black

background, read:  "In any war between the civilized man and the savage, support the civilized

man."  Beneath that, in blue, were two Stars of David, and the words:  "Support Israel."  Below

that, in red text, it read:  "Defeat Jihad."  The AFDI Ad informed readers that it was paid for by

AFDI; it directed readers to AtlasShrugs.com, SIOAonline.com, and JihadWatch.com.  *Id*. at Ex. M.



**The AFDI Ad**

AFDI sought to run the Ad on the tails of approximately 318 NYCTA buses for four weeks, at a cost of approximately $25,000.  *Id*. ¶ 45.

On September 21, 2011, after reviewing the AFDI Ad, CBS Outdoor Group sent an email to Geller.  The email stated that CBS Outdoor Group had determined that the Ad did not conform to one of MTA's advertising standards, and that AFDI could either submit a revised ad or seek a formal determination from MTA.  *Id*. ¶ 47.  Specifically, CBS Outdoor Group stated, the AFDI Ad "contains language that, in [CBS Outdoor Group's] view, does not conform with the MTA's advertising standards regarding ads that demean an individual or group of individuals as set forth in Section 5.05(B)(11) of the MTA's Advertising Standards."  *Id*. at Ex. N.  On September 22, 2011, David Yerushalmi, AFDI's counsel, responded by email.  *Id*. at Ex. O.  He disputed that the Ad violated the no-demeaning standard, noting that the Ad did not refer to any individual or group identified within that standard.  He also argued that the no-demeaning standard itself

constituted viewpoint discrimination, in violation of the First Amendment.  Yerushalmi stated

that AFDI did not intend to revise the Ad, and sought MTA's formal and final determination.  *Id.*

Rosen, MTA's Director of Real Estate, was responsible for making that determination.

Before doing so, he consulted with MTA General Counsel James B. Henly, other attorneys in the

general counsel's office, MTA Chief Financial Officer, MTA Senior Director of Corporate and

Internal Communications, and MTA Director of Communications/Press Secretary; the ultimate

decision, however, was Rosen's.  *Id.* ¶ 51.  Rosen "undertook a careful evaluation of the

proposed advertisement (together with content posted on the three websites promoted by it) and

the MTA's advertising standards pursuant to the review procedure."  *Id.*

On September 23, 2011, Rosen emailed his final determination on the AFDI Ad to CBS

Outdoor Group, requesting that it forward the email to AFDI.  *Id.* at Ex. P.  Rosen stated that

MTA had not approved the Ad, because it had "determined that the advertisement in its current

form—and AFDI has refused CBS's invitation to consider modifying its proposed

advertisement—does not conform to the MTA's advertising standards, specifically Section

5.05(B)(11)."  *Id.*  Rosen rejected AFDI's claim that the no-demeaning standard, or any portion

of the advertising standards, constitutes viewpoint discrimination.  He stated that "MTA does not

decide whether to allow or not allow a proposed ad based on the viewpoint it expresses or

because that viewpoint might be controversial," and had frequently accepted controversial ads,

including ads espousing different views on the same issue.  *Id.*

Elaborating on the basis for rejecting the AFDI Ad, Rosen stated that the use of "savage"

and "Jihad" to identify those who fail to support Israel "demeans a group (or groups) of

individuals on account of their religion, national origin, or ancestry, including Palestinians or

other Arabs or Muslims who do not share AFDI's views on Israel."  *Id.*  In reaching this

judgment, Rosen stated, MTA had "consider[ed] whether a reasonably prudent person, knowledgeable of MTA's customers and applying prevailing community standards, would believe that the advertisement contains material that ridicules or mocks, is abusive or hostile to, or debases the dignity or stature of, an individual or group of individuals." *Id.* By rejecting demeaning ads, such as AFDI's, Rosen stated, MTA furthers the "significant interest that MTA's riders and employees, when reading paid advertisements that run in or on MTA's transportation facilities, not be subjected to advertising that demeans them and that MTA not be associated with such demeaning speech." *Id.*

In his sworn declaration submitted in support of defendants in this case, Rosen added that, when reviewing the Ad, he was mindful that AFDI intended it as a response to an ad calling to "[e]nd U.S. military aid to Israel," *id.* ¶ 54 & Ex. K, and that the Ad was the successor to the two ads AFDI had proposed in March 2011 but which did not run, *id.* ¶ 54 & Ex. J. Those two proposed ads, Rosen stated, "plainly implied that the conflict between Israel and the Palestinian Authority and others was a war, a war that [] pitted 'the civilized man' (Israel) against 'the savage[,]' only instead of 'Jihad' it referred to 'Islamic Fundamentalism,' which, for AFDI, appear to be synonymous." *Id.* ¶ 54. Read within its four corners, Rosen stated, the AFDI Ad violated MTA's no-demeaning standard, because it equated supporting Israel with supporting the civilized man, and those who do not support Israel, such as "Muslims, Arabs, and Palestinians, for example," with savages—"primitive, brutal, and uncivilized." *Id.* ¶ 55. Thus, the Ad demeaned groups of people "on account of their religion, national origin, or ancestry." *Id.*

### B. Procedural History

On September 27, 2011, four days after Rosen's rejection of the AFDI Ad, plaintiffs filed the Complaint, claiming that the rejection of the Ad violated their First Amendment rights (Dkt.

1).  On October 19, 2011, defendants filed an answer (Dkt. 6).  On January 31, 2012, following

targeted discovery, plaintiffs filed this motion for a preliminary injunction (Dkt. 16).  On March

9, 2012, defendants filed opposition papers (Dkt. 22).  On March 22, 2012, plaintiffs filed reply

papers (Dkt. 26).

On April 3, 2012, the Court held a hearing in this matter.  Rosen had provided direct

testimony by means of a sworn declaration, and, at the hearing, counsel for AFDI cross-

examined him.  The Court also heard extended oral argument.

## II.    Applicable Legal Standard

In order to justify a preliminary injunction, a movant must demonstrate: (1) irreparable

harm absent injunctive relief; (2) either a likelihood of success on the merits, or a serious

question going to the merits to make them a fair ground for trial, with a balance of hardships

tipping decidedly in the plaintiff's favor; and (3) that the public's interest weighs in favor of

granting an injunction.  *See Metro. Taxicab Bd. of Trade v. City of N.Y.*, 615 F.3d 152, 156 (2d

Cir. 2010) (citation omitted).  "'When, as here, the moving party seeks a preliminary injunction

that will affect government action taken in the public interest pursuant to a statutory or

regulatory scheme, the injunction should be granted only if the moving party meets the more

rigorous likelihood-of-success standard.'"  *Id*. (quoting *Cnty. of Nassau, N.Y. v. Leavitt*, 524 F.3d

408, 414 (2d Cir. 2008)).  A party seeking a mandatory preliminary injunction, which "alters the

status quo by commanding some positive act," faces an even higher burden than likelihood of

success on the merits; such a party must make "'a clear showing that the moving party is entitled

to the relief requested, or [that] extreme or very serious damage will result from a denial of

preliminary relief.'"  *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 406 (2d Cir. 2011) (quoting

*Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35

(2d Cir. 2010)) (additional internal quotation marks and citation omitted).

Plaintiffs bring their challenge under the First Amendment, claiming that MTA's no-

demeaning standard is unconstitutional and that MTA's rejection of the Ad for non-conformity

with that standard unlawfully restricted their free speech.  Where infringement of free speech is

claimed, irreparable harm may normally be presumed, and the Court does so here.  *See Amaker*

*v. Fisher*, 453 F. App'x 59, 63 (2d Cir. 2011) (citing *Bronx Household of Faith v. Bd. of Educ. of*

*City of N.Y.*, 331 F.3d 342, 349 (2d Cir. 2003)) ("Where a plaintiff alleges injury from a rule or

regulation that directly limits speech, the irreparable nature of the harm may be presumed."); *see*

*also N.Y. Magazine v. Metro. Transp. Auth.*, 136 F.3d 123, 127 (2d Cir. 1998) ("The loss of First

Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable

injury.").  Thus, the Court must assess whether, upon a searching review of the factual record,

plaintiffs successfully demonstrate by a clear showing that they are entitled to the relief

requested under this Circuit's First Amendment jurisprudence.

## III.   Analysis

The ensuing analysis is in three parts.  First, the Court assesses whether, as MTA

determined, the AFDI Ad is prohibited under MTA's no-demeaning standard.  The Court holds

that it is—and that the Court therefore must address whether that prohibition comports with the

First Amendment.  Second, the Court analyzes the forum (advertising space on the exterior of

MTA buses) to determine the standard applicable to MTA's speech restriction.  The parties

sharply disagree on this critical issue.  Largely on the basis of the Second Circuit's decision in

*New York Magazine v. Metropolitan Transportation Authority*, 136 F.3d 123 (2d Cir. 1998), the

Court agrees with AFDI that this space is a designated public forum, in which content-based

restrictions on expressive activity are subject to strict scrutiny.  The Court therefore rejects

MTA's claim that this space is either a limited public forum or not a public forum at all, both of

which would give the government greater latitude to impose restrictions on speech.  The Court

then applies the analysis applicable to speech restrictions in designated public forums to MTA's

no-demeaning standard.

As a threshold matter, the Court notes that the AFDI Ad is not only protected speech—it

is core political speech.  The Ad expresses AFDI's pro-Israel perspective on the

Israeli/Palestinian conflict in the Middle East, and implicitly calls for a pro-Israel U.S. foreign

policy with regard to that conflict.  The AFDI Ad is, further, a form of response to political ads

on the same subject that have appeared in the same space.[3]  As such, the AFDI Ad is afforded

the highest level of protection under the First Amendment.  *See N.Y. Times Co. v. Sullivan*, 376

U.S. 254, 269 (1964) ("'The maintenance of the opportunity for free political discussion to the

end that government may be responsive to the will of the people and that changes may be

obtained by lawful means, an opportunity essential to the security of the Republic, is a

fundamental principle of our constitutional system.'") (quoting *Stromberg v. California*, 283

U.S. 359, 369 (1931)); *see also Hustler Magazine v. Falwell*, 485 U.S. 46, 50 (1988) ("At the

heart of the First Amendment is the recognition of the fundamental importance of the free flow

of ideas and opinions on matters of public interest and concern.").  The Court, therefore,

analyzes plaintiffs' claim that MTA violated the First Amendment in rejecting the AFDI Ad

"against the background of a profound national commitment to the principle that debate on

public issues should be uninhibited, robust, and wide-open."  *N.Y. Times Co.*, 376 U.S. at 270.

---

[3] At argument, counsel for MTA conceded that the AFDI Ad constitutes political speech.  Hr'g
Tr. 111, Apr. 3, 2012.

### A.  Applicability of MTA's No-Demeaning Standard to the AFDI Ad

The Court first considers whether MTA correctly determined that the AFDI Ad falls within the no-demeaning standard, *i.e.*, that the Ad demeans a person or group on account of, *inter alia*, religion, national origin, or ancestry.  AFDI, in attempting to persuade MTA to run the Ad, originally had argued that the Ad falls outside that prohibition; however, before the hearing in this case, it appeared to abandon this position.  The Court asked counsel to address this potential narrower ground for relief, mindful that, where possible, federal courts should avoid reaching constitutional questions.  *See, e.g.*, *Arizona v. Evans*, 514 U.S. 1, 33 (1995); *Bray v. Alexandria Women's Health Clinic*, 498 U.S. 1119 (1991); *United States v. Rybicki*, 354 F.3d 124, 144 (2d Cir. 2003); *Allstate Ins. Co. v. Serio*, 261 F.3d 143, 149–50 (2d Cir. 2001).

In determining whether the AFDI Ad is demeaning, the operative word in the Ad is "savage."  "Savage" is defined as: "fierce, ferocious, cruel," "uncivilized; existing in the lowest stage of culture," and "wild, undomesticated, untamed," OXFORD ENGLISH DICTIONARY (2d ed. 2012); "not civilized; barbaric" and "vicious or merciless; brutal," AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 2007); and "fierce, violent and uncontrolled," NEW OXFORD AMERICAN DICTIONARY (3d ed. 2010).  Terming a person or a people "savage" clearly demeans that individual or group.[4]  The issue presented, then, is whether the AFDI Ad demeans on the basis of religion, national origin, or ancestry, as MTA concluded, or whether the Ad instead demeans those of Israel's enemies who (regardless of their religion, national origin, or ancestry) engage in "savage" *behavior*, as AFDI originally sought to defend the Ad in its discussions with MTA.  *See* Rosen Decl. ¶ 49.

---

[4] To "demean" means to "lower in condition, status, reputation or character."  OXFORD ENGLISH DICTIONARY (2d ed. 2012); *see also* MERRIAM WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2004) (same).

In the Court's view, MTA reasonably read the AFDI Ad to target as "savages" persons who adhere to Islam, *i.e.*, Muslims.  The Ad reads:  "In any war between the civilized man and the savage, support the civilized man. / Support Israel / Defeat Jihad."  In postulating a "war" between "the civilized man" and "the savage," the Ad identifies the former as Israel and the latter as persons adhering to Jihad.  "Jihad," in turn, is widely understood to be a religious doctrine of Islam.  It is defined as: a "war or crusade for or against some doctrine, opinion, or principle; war to the death" and "a religious war of Muslims against unbelievers, inculcated as a duty by the Qur'an and traditions," OXFORD ENGLISH DICTIONARY (2d ed. 2012); a "holy war waged on behalf of Islam as a religious duty," MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed.); "a war or struggle against unbelievers," NEW OXFORD AMERICAN DICTIONARY (3d ed. 2010); and "the central doctrine that calls on believers to combat the enemies of their religion," BRITTANICA CONCISE ENCYCLOPEDIA (15th ed. 2009).[5]

To be sure, there are likely adherents to Jihad who are non-Muslims, such that the Ad can literally be read to assail as savages all adherents to Jihad regardless of their religion—much as there assuredly are many adherents to Islam who do not accept Jihad, at least when defined as a violent crusade against enemies generally, or against Israel specifically.  But, realistically, when it is read as a reasonable person would, the AFDI Ad plainly depicts Muslims—the primary adherents to this tenet of Islam—as "savages."

---

[5] The word's meaning does depend, in part, on context.  The Oxford Companion to Military History, for example, differentiates between "'the greater jihad,' a spiritual struggle against the evil within oneself" and a "'lesser jihad,' physical effort in the cause of Islam."  OXFORD COMPANION TO MILITARY HISTORY (2001).  The word derives from the "Arabic root meaning 'to strive,' 'to exert,' 'to fight,'" and may be used to express "a struggle against one's evil inclinations" or "a struggle for the moral betterment of the Islamic community."  OXFORD DICTIONARY OF ISLAM (2003).

A review of the websites to which viewers of the AFDI Ad are referred confirms the reasonableness of MTA's understanding of the Ad's message. MTA consulted these websites in the course of making its determination, *see* Declaration of MTA Associate Counsel Peter Sistrom ("Sistrom Decl.") ¶¶ 2–7, and doing so was appropriate: Because these websites are listed in the AFDI Ad itself, they are fairly considered in assessing how a reasonable reader would interpret the Ad.

In particular, at the time the Ad was under consideration, the first of those websites, www.AtlasShrugs.com—of which plaintiff Pamela Geller, AFDI's Executive Director, is editor and publisher—reproduced three relevant articles by Geller. Each echoes the "civilized man vs. savages" theme of the AFDI Ad. For a viewer of the AFDI Ad who consulted the website, each of Geller's articles would shed light on who precisely the Ad depicts as a "savage." *Id.*

In the first article, entitled "Glenn Beck and the Struggle for Israel's Survival," Geller writes that "[t]he Jewish people" are "under relentless and unremitting attack from the Muslim world," and that this struggle is:

> the struggle between good and evil. The hatred of Israel is a hatred that in itself is reviled by good rational men. Islamic societies are among the least developed cultures, the product of nomadic civilization. Their culture is primitive and barbaric, and they hate Israel because it is the sole beacon of modern science and civilization and technology in the Middle East.

Geller then quotes Ayn Rand: "[W]hen you have civilized men fighting savages, you support the civilized men, no matter what." Geller goes on to contrast Israel (a "free society") with "the Muslim countries" ("slave societies"). Geller then warns Muslim that if they were to succeed with their "conquest of Israel," they would "die as well," because "their survival depends on their constant jihad, because without it they will lose the meaning and purpose of their existence." *Id.* ¶ 3 & Ex. A.

In the second article, entitled "Fatal Thinking," Geller writes that "Iran's nukes are not just Israel's problem.  They are the non-Muslim world's problem.  It is the world's complicity with Islamic barbarism that catapults the Jewish issue to the fore because of the fierce Jew-hatred that is commanded in Islam."  *Id*. ¶¶ 4–5 & Ex. B.  Geller adds:

> Even the godless cannot escape this religious war declared on the world by Islam.  The fact is, this is a values issue.  Right and wrong.  Good and evil.  And what side you are on in the war between the civilized man and the savage speaks volumes about your character, your credibility, and your morality.

*Id.* at Ex. B.

Finally, in an article entitled "Civilized Man vs. Savage," Geller recounts an incident involving an Arab woman who was treated for burns by an Israeli plastic surgeon and was later arrested wearing a suicide belt, en route to blowing up the hospital at which she had been treated.  Geller writes that that story "is only an example of the war between Jews and Muslims in the land of Israel"—a war that "is not a territorial conflict.  This is a civilizational conflict."  *Id.* ¶ 6 & Ex. C.

In light of these articles, to which the AFDI Ad effectively referred its viewers, MTA was reasonable—indeed, clearly correct—to regard the AFDI Ad as demeaning a group of people based on religion (Islam) and/or national origin and ancestry (from "Muslim countries" in the Middle East).  The Court therefore cannot resolve this case on the non-constitutional ground that MTA misapplied its no-demeaning standard.  The Court must instead address the constitutionality of that standard.

### B.  Forum Analysis

#### 1.  Categories of Forums

Where the government seeks to restrict speech by restricting access to its own property, the level of scrutiny to which the restriction is subjected depends on how the property is

categorized as a forum for speech.  This forum analysis is a "means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for [expressive] purposes."  *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 800 (1985); *see also id.* (noting that the government, like a private individual, has the "power to preserve the property under its control for the use to which it is lawfully dedicated") (internal citation and quotation marks omitted).  In its First Amendment jurisprudence, the Supreme Court has classified government property into three general categories: traditional public forums, designated public forums, and nonpublic forums. *See Christian Legal Soc'y v. Martinez*, 130 S. Ct. 2971, 2984 n.11 (2010); *see also Hotel Emps. & Rest. Emps. Union v. City of N.Y. Dep't of Parks & Rec.*, 311 F.3d 534, 544–46 (2d Cir. 2002). Once a court has determined the type of forum at issue, it then applies the requisite standards for that forum to the challenged speech restriction.

The first category, the traditional public forum, refers to areas, such as public streets and parks, "which have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions."  *Pleasant Grove City, UT v. Summum*, 555 U.S. 460, 469 (2009) (internal citations and quotation marks omitted); *see also N.Y. Magazine*, 136 F.3d at 128.  In a traditional public forum, content-based restrictions on speech must survive strict scrutiny: *i.e.*, the restriction must be narrowly tailored to serve a compelling government interest.  *Hotel Emps.*, 311 F.3d at 545; *see also Pleasant Grove City*, 555 U.S. at 469.  The government may impose content-neutral time, place, and manner restrictions; however, these must be "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication."  *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983).

The second category, the designated public forum, refers to government property which, although not a traditional public forum, has been "intentionally opened up for that purpose." *Christian Legal Soc'y*, 130 S. Ct. at 2984 n.11; *see also Cornelius*, 473 U.S. at 802; *N.Y. Magazine*, 136 F.3d at 128.  Because the government, as property owner, has opened up a designated public forum to the same breadth of expressive speech as found in traditional public forums, the same standards apply:  Any content-based restrictions on speech must survive strict scrutiny, meaning they must be narrowly tailored to serve a compelling government interest, and content-neutral time, place, and manner restrictions are permissible only if they are narrowly tailored and leave open other avenues for expression.  *See Pleasant Grove City*, 555 U.S. at 469–70; *Int'l Action Ctr. v. City of N.Y.*, 587 F.3d 521, 526–27 (2d Cir. 2009) (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)); *Hotel Emps.*, 311 F.3d at 545.

The final category of governmental property identified by the Supreme Court consists of non-public forums.  Non-public forums are property that "the government has not opened for expressive activity by members of the public."  *Hotel Emps.*, 311 F.3d at 546; *see also Perry Educ. Ass'n*, 460 U.S. at 45–46.  Examples include airport terminals, military bases and restricted access military stores, and jailhouse grounds.  *Hotel Emps.*, 311 F.3d at 546.  Restrictions on speech in non-public forums must only be "reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view."  *Perry Educ. Ass'n*, 460 U.S. at 46; *see also Cornelius*, 473 U.S. at 800; *Hotel Emps.*, 311 F.3d at 546 ("The government may restrict speech in non-public fora subject only to the requirements of reasonableness and viewpoint neutrality.").[6]

---

[6] In the Second Circuit, another category of forum, known as the limited public forum, has alternately been analyzed as a subset of the designated public forum and as a type of non-public forum opened up for discrete purposes.  *See Byrne v. Rutledge*, 623 F.3d 46, 55 n.8 (2d Cir.

2.  The *New York Magazine* Precedent

The forum in this case consists of the advertising space on the exterior of New York City public buses.  In *New York Magazine v. Metropolitan Transportation Authority*, the Second Circuit addressed that very forum.  It held that this space was a designated public forum.  Because the parties' arguments on the forum issue turn centrally on whether *New York Magazine* controls here, the Court begins by reviewing that decision in detail.

At issue in *New York Magazine* was an ad which New York Magazine, a weekly publication featuring (among other things) news and commentary about New York City, contracted with MTA to run on buses.  The ad depicted the magazine's logo with copy that read: "Possibly the only good thing in New York Rudy hasn't taken credit for."  The week after the ad began to run, Mayor Rudolph Giuliani's office called MTA, and claimed that the ad violated § 50 of the New York Civil Rights Law, which bars the unconsented-to use of the names or pictures of living persons for advertising purposes.[7]  Because MTA's advertising standards

---

2010) ("the law of [the Second Circuit] describes a limited public forum as both a subset of the designated public forum and a nonpublic forum opened to certain kinds of speakers or to the discussion of certain subjects") (internal quotation marks and citations omitted).  Limited public forums are property that the government has opened up for some speech, but "'limited to use by certain groups or dedicated solely to the discussion of certain subjects.'"  *Christian Legal Soc'y*, 130 S. Ct at 2984 n.11 (quoting *Pleasant Grove City*, 555 U.S. at 470).  Common examples of limited public forums include "state university meeting facilities opened for student groups, open school board meetings, city-leased theaters, and subway platforms opened to charitable solicitations."  *Hotel Emps.*, 311 F.3d at 545 (internal citations omitted).  The government has more leeway to restrict speech in a limited public forum than in a traditional or designated public forum.  However, any restrictions on speech in such a forum must be viewpoint-neutral, and the choice to exclude particular speech must be reasonable in light of the forum's purpose.  *See Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106–07 (2001); *Rosenberg v. Rector & Visitors of Univ. of VA*, 515 U.S. 819, 829 (1995); *Cornelius*, 473 U.S. at 806.

[7] Section 50 of the New York Civil Rights Law reads:

> Right of privacy.  A person, firm or corporation that uses for advertising purposes, or for the purposes of trade, the name,

prohibit the display of any ad which violates § 50, *see supra* § I.A.ii, MTA complied with Mayor Guiliani's request, and ceased to run the ad. *N.Y. Magazine*, 136 F.3d at 125.

New York Magazine thereupon brought suit against MTA and New York City in this Court, seeking, *inter alia*, injunctive relief under the First and Fourteenth Amendments. The district court granted preliminary injunctive relief; the defendants appealed. The Second Circuit affirmed that order with respect to MTA.[8]

The Second Circuit's decision in *New York Magazine* turned heavily on its determination that the advertising space on the exteriors of New York City public buses was a designated public forum, as New York Magazine had argued. (MTA argued, as it does here, that it was a non-public forum.) The Second Circuit began by noting that "whether government property is designated a public forum or not depends on the government's intended purpose for the property." *N.Y. Magazine*, 136 F.3d at 129. To determine the government's intent in opening up the forum, the Court stated, it examined: (1) "the nature of the property and its compatibility with expressive activity"; (2) "the nature of the restraints on speech imposed"; and (3) "the policies by which it governed the use of the forum." *Id.* Also relevant was whether MTA, in selling advertising space, was acting in a proprietary or regulatory capacity. *Id.*

As the Second Circuit noted, where the government opens a property for speech in its proprietary capacity to raise revenue or facilitate internal affairs, the Supreme Court has considered the forum non-public, thereby subjecting speech restrictions to only a reasonableness

---

portrait or picture of any living person without having first
obtained the written consent of such person, or if a minor of his or
her parent or guardian, is guilty of a misdemeanor.

Section 51 creates causes of action in equity and damages for violations of § 50.

[8] The Second Circuit ordered that the City be dismissed, because New York Magazine lacked standing to assert a claim against the City. *N.Y. Magazine*, 136 F.3d at 127.

test.  *Id.* (citing *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992);

*Lehman v. City of Shaker Heights*, 418 U.S. 298, 303 (1974); *Cornelius*, 473 U.S. at 805).  By

contrast, when the government has acted for the purpose of benefitting the public, it has held the

forum to be public, subjecting speech restrictions to a more demanding standard.  *Id.* (citing

*Widmar v. Vincent*, 454 U.S. 263, 267–69 (1981); *Southeastern Promotions, Ltd v. Conrad*, 420

U.S. 546, 555 (1975)).

    Finally, the Second Circuit noted, in determining the Government's intent for a forum,

the Supreme Court has examined not only "the characteristics of the forum, but also the policies

by which it governed the use of that forum."  *N.Y. Magazine*, 136 F.3d at 129.  As to this point,

the Court rejected MTA's claim that by restricting access to the forum through its advertising

standards, MTA had "evidence[d] an intent not to create a public forum."  *Id.*  The Court stated:

"[I]t cannot be true that if the government excludes any category of speech from a forum through

a rule or standard, that forum becomes ipso facto a non-public forum, which is to exclude speech

based on content."  *Id.* at 129–30.  That proposition "would eviscerate the [Supreme] Court's

own articulation of the standard of scrutiny applicable to designated public fora."  *Id.* at 130.

Instead, the fact that a forum prohibits certain categories of speech is relevant because "the

*nature* of the excluded categories sheds light on whether the government was acting primarily as

a proprietor or a regulator."  *Id.*  Thus, for example, "[d]isallowing political speech, and allowing

commercial speech only, indicates that making money [as a proprietor] is the main goal,"

whereas "[a]llowing political speech . . . evidences a general intent to open a space for discourse,

and a deliberate acceptance of the possibility of clashes of opinion and controversy . . . [that are]

inconsistent with sound commercial practice."  *Id*.

Applying these principles, the Second Circuit held that the advertising space on the exteriors of public buses was a designated public forum.  In so holding, the Court emphasized that MTA "accepts both political and commercial advertising" in that space, with the knowledge that "clashes of opinion and controversy" in political advertising could have adverse commercial effect.  *Id.* at 129–30.  Opening up its ad space up to potentially controversial political speech, a practice "inconsistent with sound commercial practice," was the action of a regulator, not a commercial proprietor.  *Id*. at 130.  The Second Circuit found further support for this conclusion in the specific advertising standard at issue in the case, which prohibited ads which "violate[] New York Civil Rights Law § 50."  Because MTA's articulated interest in applying that standard was to assure compliance with law, MTA was properly held to be acting in a regulatory, not a commercial, role.  *Id.*

> 3.  Analysis

As in *New York Magazine*, the parties vigorously disagree whether the advertising space on the exteriors of MTA buses is a designated public forum (AFDI's view) or a limited or non-public forum (MTA's view).  From this Court's perspective, however, the issue is one of *stare decisis*:  The Second Circuit's decision in *New York Magazine*, which dealt with the identical forum, binds this Court and controls this case, barring material changes in the nature of that forum, or the policies governing it.  And it is undisputed that there have been no such changes in MTA's policies and practices governing bus ads since *New York Magazine*.  *See* AFDI Mem. 9 n.2; Hr'g Tr. 103, Apr. 3, 2012.  The reassessment of the categorization of this forum which MTA seeks, therefore, must be made by the Second Circuit or the Supreme Court.  It cannot be made by this Court.

In any event, the arguments MTA makes for reassessing the forum designation are not compelling.  MTA argues, first, that Second Circuit forum doctrine has evolved since *New York Magazine*.  There, MTA notes, the Circuit defined a designated public forum as "a place the government has opened for use by the public for expressive activity," 136 F.3d at 128; however, in its 2002 decision in *Hotel Employees & Restaurant Employees Union v. City of New York Department of Parks & Recreation*, 311 F.3d 534 (2d Cir. 2002), the Circuit referred to a designated forum as "a non-public forum that the government has opened for *all* types of expressive activity," *id.* at 545 (emphasis in original).  Seizing on the Circuit's use of the word "all," MTA argues that the advertising space on the exteriors of buses would fail to qualify as a designated public forum under the *Hotel Employees* formulation, because MTA does limit expression there, including via the no-demeaning standard.  MTA Mem. 13–14.

MTA, however, assigns more weight to the locution used in *Hotel Employees* than is merited.  First, to the extent that the Second Circuit's use of the qualifier "all" in that decision is said to bespeak a doctrinal shift since *New York Magazine*, the Supreme Court case that the Second Circuit cited for that proposition in *Hotel Employees*, *Cornelius v. NAACP Legal Defense & Education Fund*, tellingly, predates *New York Magazine*.  *See Hotel Emps.*, 311 F.3d at 545; Hr'g Tr. 94, Apr. 3, 2012.  Thus, although *Hotel Employees* conceivably reflects a subtle honing of the language the Circuit uses to articulate its forum doctrine, that decision is not fairly read as more consequential than that, and certainly does not, *sub silentio*, overturn *New York Magazine*.  Second, the forum in this case meets the *Hotel Employees* designated-public-forum formulation:  The exteriors of MTA buses are, undisputedly, "open for *all* types of expressive activity"—*e.g.*, political, commercial, religious, charitable, military, etc.  That MTA imposes restrictions within those types of expression (*e.g.*, no violent images, no false or misleading

25

speech, no offensive sexual material, and no demeaning speech) does not alter this conclusion. Notably, the paradigmatic examples of non-public forums cited in *Hotel Employees*—"airport terminals," "military bases and restricted access military stores," and "jailhouse grounds," all characterized by severe restrictions on types of speech—are a far cry from the ad space at issue here. *See Hotel Emps.*, 311 F.3d at 546 (describing non-public forums as "property that the government has not opened for expressive activity by members of the public").

MTA alternatively seeks to distinguish *New York Magazine* on the facts. It argues that, although the rules and practices with respect to bus ads are unchanged since that decision, MTA has compiled in this litigation a more substantial factual record than it had previously that its goal in opening up the exteriors of buses for ads, including in the form of political speech, is to raise money. *See* MTA Mem. 14–15; Rosen Decl. ¶¶ 4–5; Hr'g Tr. 94–95, Apr. 3, 2012. But MTA's stated goal of making money from selling ad space on the outside of buses was presented to the Second Circuit at the time of *New York Magazine*, and did not carry the day. *See N.Y. Magazine*, 136 F.3d at 133 (Cardamone, J., dissenting). More fundamentally, in inferring the government's intent with respect to a particular forum, the Supreme Court and the Second Circuit have not deferred to the testimony of governmental decisionmakers. And any such mode of First Amendment analysis would perforce treat any paid advertising space on government property as a non-public forum, as long as the government officials responsible for that space attested that they were motivated to bring in revenue. Rather, the government's intent as to a particular forum—a legal construct—is to be discerned from policy and practice, including, the characteristics of the forum and the policies governing speech there. *See Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 302–03 (2000) (Court looks to government's "policy [and] practice" with regard to the forum at issue to conduct the forum analysis); *Hazelwood Sch. Dist. v.*

*Kuhlmeier*, 484 U.S. 260, 269–70 (1988) (same) (citing *Perry Educ. Ass'n*, 460 U.S. at 47);
*Hotel Emps.*, 311 F.3d at 547; *N.Y. Magazine*, 136 F.3d at 129.  As to the forum in question here,
those factors are unchanged since *New York Magazine*.

Finally, MTA notes that a factor cited in *New York Magazine* to support finding a
designated public forum—the specific advertising standard at issue there, prohibiting ads that
violated New York Civil Rights Law § 50, *see* 136 F.3d at 130—is absent here.  But, for two
reasons, that argument is not dispositive on the forum issue.  First, in *New York Magazine*, the
Second Circuit cited the government's regulatory (*i.e.*, non-proprietary) purpose in enacting the
standard as confirmation for its designated public forum determination, not as the basis for it.  *Id.*
Second, the standard at issue here is equally characterized as regulatory.  To be sure, one reason
for the no-demeaning standard was to protect MTA's interest "in avoiding the possibility of
being associated with such ads and in protecting its reputation as a provider of service to all
persons on a non-discriminatory basis."  Rosen Decl. ¶ 22.  But MTA has also justified the no-
demeaning standard as a means of assuring that bus ads do not undermine civility within its
diverse ridership, and of "furthering the interests of MTA patrons in avoiding unwanted and
unavoidable confrontations with demeaning advertisements."  *See, e.g.*, *id.*; MTA Mem. 1, 3, 17,
18.  Although civic harmony is surely beneficial to MTA commercially, as a goal, the Court
regards it as, fundamentally, regulatory.

The Court, therefore, concludes that the advertising space on the exteriors of MTA buses
is a designated public forum.

### C.  Application of the First Amendment to MTA's No-Demeaning Standard

As noted, the same constitutional protections for speech that apply in a traditional public
forum apply in a designated public forum, and "[v]irtually all regulations of speech in these

forums are subject to the highest level of First Amendment scrutiny." *Byrne*, 623 F.3d at 53; *see also Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 341 (2d Cir. 2010); *Peck ex rel. Peck v. Baldwinsville Cent. Sch. Dist.*, 426 F.3d 617, 626 (2d Cir. 2005).  AFDI argues that MTA's no-demeaning standard is unconstitutional under these standards, for a number of independent reasons.  *See infra* p. 34 note 14.  However, to resolve this case, the Court need reach only one of AFDI's arguments, which is that MTA's no-demeaning standard impermissibly discriminates among speech on the basis of its content.

In a traditional or designated public forum, content-based regulations are presumptively invalid.  *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992) (citing *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 115 (1991)); *Regan v. Time, Inc.*, 468 U.S. 641, 648–49 (1984).  In such forums, "content-based restrictions will be upheld only if they are necessary to serve a compelling state interest and are narrowly drawn to achieve that end." *Peck*, 426 F.3d at 626.  In determining whether a speech restriction is content-based as opposed to content-neutral, the Court inquires whether the regulation "is justified without reference to the content of the regulated speech." *Mastrovincenzo v. City of N.Y.*, 435 F.3d 78, 98 (2d Cir. 2006) (citations omitted); *see also Boos v. Barry*, 485 U.S. 312, 318–19 (1988) (invalidating as content-based a regulation prohibiting signs protesting a foreign government within 500 feet of that government's embassy, because "[o]ne category of speech has been completely prohibited [whereas] [o]ther categories of speech . . . are permitted").

The Supreme Court's 1992 decision in *R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992), is singularly instructive in considering AFDI's claim that MTA's regulation is content-based.  Overturning a conviction based on a burning of a cross, the Court in *R.A.V.* held facially invalid a municipal ordinance prohibiting bias-motivated disorderly conduct.  The ordinance prohibited

the display of a symbol which one knows or has reason to know "arouses anger, alarm or resentment in others on the basis of race, color, creed, religion or gender"; state courts had construed the ordinance to apply only to "fighting words." *See R.A.V.*, 505 U.S. at 377, 391. The Court recognized that fighting words are often proscribable. But, even so, it held, St. Paul's ordinance violated the First Amendment, because it drew a content-based distinction among fighting words. The Court explained:

> [T]he ordinance applies only to "fighting words" that insult, or provoke violence, "on the basis of race, color, creed, religion, or gender." Displays containing abusive invective, no matter how vicious or severe, are permissible unless they are addressed to one of the specified disfavored topics. Those who wish to use "fighting words" in connection with other ideas—to express hostility, for example, on the basis of political affiliation, union membership, or homosexuality—are not covered. The First Amendment does not permit St. Paul to impose special prohibitions on those speakers who express views on disfavored subjects.

*Id.* at 391.

Viewed in light of the decision in *R.A.V.*, it is unavoidably clear that MTA's no-demeaning standard differentiates based on the content of the proposed ad. It proscribes ads that demean a person or group on account of one of nine enumerated subjects: "race, color, religion, national origin, ancestry, gender, age, disability or sexual orientation." But, outside of these "specified disfavored topics," *R.A.V.*, 505 U.S. at 391, MTA's standard permits all other demeaning ads.

Thus, MTA's standard permits ads that demean individuals or groups based on a host of circumstances and characteristics—including place of residence, personal history, education, occupation or employment, physical characteristics (other than disability), political affiliation, union membership, point of view, or behavior. MTA so acknowledged at the hearing in this case. It conceded that the no-demeaning standard does not empower MTA to proscribe

demeaning ads aimed at an individual or group on account of anything other than "race, color, religion, national origin, ancestry, gender, age, disability or sexual orientation." *See* Hr'g Tr. 17, 21, 25, 99, 101, 105–06, 122–23, Apr. 3, 2012.

To illustrate the point concretely, under MTA's no-demeaning standard, an advertiser willing to pay for the privilege is today at liberty to place a demeaning ad on the side or back of a city bus that states any of the following:  "Southerners are bigots"; "Upper West Siders are elitist snobs"; "Fat people are slobs"; "Blondes are bimbos"; "Lawyers are sleazebags"; or "The store clerks at Gristedes are rude and lazy."  The regulation also does not prohibit an ad that expresses: "Democrats are communists"; "Republicans are heartless"; or "Tea Party adherents are barbaric."  The standard would also countenance an ad that argues:  "Proponents [or opponents] of the new health care law are brain-damaged."  Strikingly, as MTA conceded at argument, its no-demeaning standard currently permits a bus ad even to target an individual private citizen for abuse in the most vile of terms.  For example:  "John Doe is a child-abuser"; "Jane Doe runs a Ponzi scheme"; or "My neighbors, the Does, are horrible parents."[9]  Hr'g Tr. 26, 108, Apr. 3, 2012.

Thus, like the St. Paul ordinance invalidated in *R.A.V.*, MTA's no-demeaning standard, as presently worded, overtly differentiates among speech based on the target of the speech's abuse and invective.  *R.A.V.* involved fighting words, whereas this case involves demeaning bus ads, but the First Amendment evil is the same:  By differentiating between which people or groups can and cannot be demeaned on the exterior of a city bus, MTA's no-demeaning standard, like St. Paul's ordinance, discriminates based on content.  Indeed, the discrimination here is, in an

---

[9] To be sure, in its other standards, MTA prohibits, *inter alia*, libelous ads or ads that contain false or misleading claims.  However, there does not appear to be any basis in MTA's current standards to reject a demeaning ad directed at an individual where the ad demeans based on statements of opinion, or based on truthful facts.

important respect, more invidious than the fighting-words ordinance in *R.A.V.*:  As this case

illustrates, the content discrimination embedded in MTA's no-demeaning standard applies to and

among political speech, the speech most highly protected by the First Amendment.  *Cf. Solantic,*

*LLC v. City of Neptune Beach*, 410 F.3d 1250, 1264 (11th Cir. 2005) (invalidating a municipal

sign code because of its content-based exemptions, the effect of which was to differentiate

among political messages, only some of which could be lawfully conveyed on signs).

The derogatory term at issue in the AFDI Ad, "savage," in fact, supplies an excellent

vehicle for illustrating the content-specificity of MTA's no-demeaning standard.  Under that

regulation, an ad on a public bus may not call a person or group "savage" based on his or her

religion or nationality, or because the person or group falls within the other seven proscribed

categories delineated in the regulation.  But such an ad may otherwise call another person or

group a "savage" or "savages" on any other basis—because they are a neighbor, a family, a

school, an employer, an employee, a company, a union, a community group, a charity, an interest

group, a believer in a cause, or a political foe.[10]  Under *R.A.V.*, that line is, unavoidably, content-

based.  Not surprisingly, pressed at argument on this point with the use of such hypotheticals,

MTA ultimately—and properly—conceded that its no-demeaning standard is content-based.

Hr'g Tr. 122, Apr. 3, 2012.[11]

---

[10] Indeed, at argument, counsel for MTA conceded that, if the AFDI Ad had been modified to
drop the word "Jihad" and to read, "People who believe in a holy war are savages," MTA
probably would have been obliged to permit that ad to appear.  Hr'g Tr. 101, Apr. 3, 2012.  He
conceded that "[i]t is the 'jihad' word" that caused the Ad to contravene MTA's current
regulation.  *Id.*

[11] In its brief, MTA had argued that the no-demeaning standard was content-neutral, based on the
decision in *International Action Center v. City of New York*, 587 F.3d 521 (2d Cir. 2009).  The
Second Circuit there stated that "where the standard or rule applies without regard to the basic
message being expressed, it is content-neutral."  *Id.* at 525–26.  *International Action Center* is,
however, inapposite.  At issue there was a regulation banning the issuance of permits to "new"

MTA does not offer any justification for selectively allowing demeaning speech to appear on the exterior of its buses, let alone demonstrate that its content-based restriction on transit advertising is narrowly tailored to serve a compelling governmental interest, as is necessary to survive strict scrutiny.[12]  *See Pleasant Grove City*, 555 U.S. at 469–70; *Hotel Emps.*, 311 F.3d at 545.  Whatever weight might be assigned to the governmental interest in banning demeaning speech on the exterior of New York City buses on an even-handed basis, there is no good reason for protecting some individuals and groups, but not others, from such abuse.  MTA's no-demeaning standard, as currently formulated, is, therefore, inconsistent with the First Amendment.

---

parades (*i.e.*, ones not previously held) along Fifth Avenue in Manhattan.  *Id.* at 523.  The regulation was enacted to "keep public spaces safe and free of congestion," to protect "citizens from unwelcome noise," and "to preserve the quality of urban life."  *Id.* at 527.  The Second Circuit found that regulation content-neutral, because it "does not seek to regulate messages or distinguish between different types of speech" and "applies to all 'new' parades, irrespective of their content."  *Id.* at 526.  Here, by contrast, MTA's no-demeaning standard facially discriminates based on the content of expression.  Further, as outlined by MTA itself, the purpose served by the standard relates "to the content of expression," *Ward*, 491 U.S. at 791:  It seeks to: (1) shield the citizenry from confronting certain types of verbal or pictorial disparagement contained in ads on public buses, and (2) respect "the interests of MTA patrons in avoiding unwanted and unavoidable confrontations with demeaning advertisements."  Rosen Decl. ¶ 22.

[12] Before this Court, MTA instead defended the no-demeaning standard on other grounds.  It predominantly argued, as noted, that the advertising space on the exterior of city buses was a non-public forum, in which a speech restriction need only be reasonable and viewpoint-neutral.  The Court has rejected that claim; it has no occasion here to opine whether a regulation that prohibited only some demeaning speech would be valid in a non-public forum.  MTA alternatively argued that the no-demeaning standard was content-neutral, an argument the Court has rejected.  Finally, MTA suggested that its ban on demeaning speech could be justified as a ban on "fighting words."  MTA Mem. 16–17; Hr'g Tr. 106, Apr. 3, 2012.  However, that argument fails, because the no-demeaning standard sweeps far beyond the narrow category of "fighting words," because there is no record evidence that demeaning ads on bus exteriors (as opposed to in-person slurs) would incite violence, and because a municipality's selective ban on fighting words which favors only certain targets would be clearly unconstitutional under *R.A.V.*

In holding today that MTA's no-demeaning standard violates the First Amendment, the Court does not impugn in the slightest the motives of MTA and its officials—either those who put the standard into place or those who applied it to the AFDI Ad.  Quite the contrary:  From the testimony and evidence, it is apparent that, in promulgating and applying the no-demeaning standard, MTA has aspired to hold ads on public buses to a standard of civility.  Its goal of preventing ads on city bus exteriors from being used as a medium for abuse and division in this diverse metropolis is entirely laudable.  It appears likely that MTA drafted the standard in question with an eye toward the groups it felt most likely to be targeted by demeaning ads, without adequately considering the First Amendment implications under *R.A.V.* of such a selective prohibition.

However, it is well-settled that, where a violation of the First Amendment is concerned, the government's benign, even noble, intentions are no cure.  *See Texas v. Johnson*, 491 U.S. 397, 418 (1989) (in invalidating prohibition on desecrating American flag, Court explains that "[i]t is not the State's ends, but its means, to which we object"); *see also Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 680 (1994) (O'Connor, J., concurring in part and dissenting in part); *United States v. Eichman*, 496 U.S. 310, 316–19 (1990); *Baggett v. Bullitt*, 377 U.S. 360, 373 (1964); *Pico v. Bd. of Ed., Island Trees Union Free Sch. Dist. No. 26*, 638 F.2d 404, 416 (2d Cir. 1980).

Today's ruling does not disable city authorities from adopting rules that hold ads and commentary on the exteriors of buses to a standard of civility.  *See, e.g.*, *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 90 (1st Cir. 2004) (upholding transit authority's regulation that prohibited, *without further limitation*, "advertisements that 'demean[] or disparage[] an

individual or group of individuals'").[13]  And in resolving this case on the narrow ground that the

no-demeaning standard as currently drafted is impermissibly content-based, the Court pointedly

does not reach any of the broader grounds for invalidation urged by AFDI under the First

Amendment.[14]  Today's ruling instead leaves—and is intended to leave—MTA the latitude to

investigate and experiment with alternative mechanisms for using ad space on the exteriors of

city buses productively, profitably, and constitutionally, while ensuring that this space is not used

as a tool for disparagement and division.

---

[13] The First Circuit so ruled in *Ridley* after holding, based on a close examination of the history, usage, and close regulation of the advertising space in question, that the government had not created a designated public forum.  390 F.3d at 76–82.

[14] These include that: (1) a ban on demeaning speech in a designated public forum can never be upheld, because it is not one of few categories of speech (*e.g.*, obscenity, fighting words, and defamation) that can be banned outright on account of having little or no social value, *see* Hr'g Tr. 75, Apr. 3, 2012; *cf. R.A.V.*, 505 U.S. at 382; (2) even an across-the-board ban on demeaning speech is itself content-based and subject to strict scrutiny, because such a ban draws a line between demeaning and non-demeaning content; (3) a ban on demeaning speech is impermissibly viewpoint-based, because it uniquely prohibits a form of harsh condemnation; and (4) a ban on demeaning speech, either inherently or as administered by MTA, is unconstitutionally vague, and vests undue authority in those charged with enforcing it.  If MTA is inclined to repair the defect which the Court has identified today and substitute a new regulation while maintaining the exterior of public buses as a designated public forum, its counsel is well-advised to give thoughtful attention to these critiques.

## CONCLUSION

For the reasons discussed above, AFDI's motion for a preliminary injunction enjoining the enforcement of MTA's no-demeaning standard is GRANTED.

In order to enable MTA to consider its appellate options and alternatives to the current regulation, the Court, in the public interest, will stay the effect of this Order for 30 days. Absent a court order extending it, after 30 days, this stay will expire.

The Clerk of Court is directed to terminate the motion pending at docket entry number 16.

A conference in this case is scheduled for August 29, 2012, at 11:00 a.m., at the U.S. Courthouse, 500 Pearl Street, New York, New York 10007. The parties are directed to meet and confer in advance of the conference, and to advise the Court by joint letter, due August 24, 2012, as to their respective views on the next steps to be taken, if any, in this litigation.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: July 20, 2012
      New York, New York

35